Filed 5/15/24  In re C.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.B., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082494 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ2000156) |
| v. | OPINION |
| E.M., et al. | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.  Conditionally reversed and remanded with directions.

Neale B. Gold, under appointment by the Court of Appeal for Defendant and Appellant, E.M.

Elizabeth C. Alexander, under appointment by the Court of Appeal for Defendant and Appellant, D.B.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp Deputy County Counsel for Plaintiff and Respondent.

The juvenile court denied E.M. (Mother) and D.B. (Father) reunification services at disposition and set a hearing under Welfare and Institutions Code section 366.26 (unlabeled statutory citations refer to this code).  Almost one year later, Mother filed a petition under section 388 asking for reunification services.  The court denied the petition and terminated parental rights.  Mother argues that the court abused its discretion by denying her section 388 petition.  In addition, both Mother and Father argue that the Riverside County Department of Public Social Services (DPSS) and the juvenile court failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related state law.  We conclude that the court did not abuse its discretion by denying Mother's section 388 petition.  Mother failed to show that reunification services would promote C.B.'s best interests.  But we agree with the parents that DPSS did not fully comply with its statutory duty of further inquiry concerning ICWA, and we therefore conditionally reverse the order terminating parental rights and remand for further proceedings.

BACKGROUND

I.    *Prior Dependency Cases*

Mother claimed that she did not know she was pregnant with B.B. until January 31, 2020.  She tested positive for methamphetamines and amphetamines the following day.  Less than two weeks later, Mother gave birth to B.B. and tested negative for all

2

substances. The following month, B.B. was removed from Mother because of Mother's history of substance abuse and unstable housing. B.B. was removed from Father because of concerns including substance abuse, unstable housing, and his child welfare history for general neglect.

Both parents participated in reunification services. The parents were referred to random drug testing but attempted to "dictate who and what they would do regarding their drug test[s]." When the testing office refused to comply, the parents would leave. Mother completed parenting classes, and she failed to complete individual counseling. Mother did not submit to a hair follicle test. She was discharged from her substance abuse program for noncompliance. Mother said that she could not participate in drug tests through the program, claiming that she had to work, but other documentation showed that Mother was unemployed and collecting unemployment benefits.

DPSS later learned that Mother had been terminated from her substance abuse program and that she had filed falsified documents to make it appear that she was compliant. Mother also falsified drug test results.

Father failed to participate in substance abuse services, tested inconsistently, and failed to submit to a hair follicle test. Both parents' reunification services were terminated as to B.B. in May 2021.

In March 2021, DPSS received a referral that Mother had given birth to S.B. a few days prior and used a false name at the hospital. Mother was "observed outside of her motel at 2:00 a.m. with the child in a stroller, walking back and forth" and exhibiting

3

"odd behaviors." DPSS placed S.B. in protective custody in the care of her maternal grandmother. Both parents were bypassed for reunification services as to S.B.

II.     *C.B.'s Referral and Detention*

DPSS responded to a Banning motel to investigate an immediate response referral. The referral indicated that Mother had given birth to C.B. in early 2022. The motel manager reported that the family had been evicted because they had not paid for their room for at least eight months. During the family's stay, the motel received "noise complaints including domestic violence, [and] verbal threats to cause harm." The manager reported that the family destroyed property and that "there were several punched holes in the walls, the headboard, microwave, television, and mirrors were broken." The manager also reported that Father threatened to kill the motel manager on multiple occasions and that Mother asked another motel guest where she could buy methamphetamine. Law enforcement eventually escorted the family off of the property. When Mother returned to collect her belongings, the motel manager refused, and Mother "chased after her in a car with [C.B.] in the backseat."

The parents cancelled two visits with their older children in March 2022. The parents later failed to appear at a permanency hearing regarding their older children.

DPSS contacted the family's Welfare-to-Work caseworker for assistance in locating the parents. In April 2022, when Mother met with her caseworker, Mother behaved normally, but she "suggested someone from the office reported her to CPS." When the caseworker offered Mother the social worker's contact information, Mother

4

declined. Mother was evasive about where the family was staying, but she eventually stated that they would be at America's Best Inn in Calimesa until mid-April.

DPSS contacted the America's Best Inn in Calimesa, but the family was not registered there. The social worker also verified that the family was not registered at any of the other motels in the area.

The parents cancelled another scheduled visit with their older children in April 2022. That same day, DPSS obtained a protective custody warrant to remove C.B. from Mother and Father.

About a week later, Mother and Father appeared by telephone for a hearing concerning C.B.'s older siblings. The juvenile court ordered the social worker to travel to the parents' address and transport them to court. Mother told the court that the family was staying at the Days Inn in Banning. When the social worker responded to that address, the motel manager reported that the family was not there.

In May 2022, DPSS filed a section 300 petition as to C.B. The petition alleged that Mother abuses methamphetamine, that she chased the motel manager in her car with C.B. present, that Father abuses methamphetamine and has a criminal history, and that both parents engage in domestic violence, lack appropriate housing, and have a child welfare history due to substance abuse and general neglect, and that two of C.B.'s siblings were dependents in Riverside County. The petition also alleged that both parents absconded with C.B. and their whereabouts were unknown.

At the detention hearing, the court issued a new protective custody warrant for C.B. and bench warrants for Mother and Father. The court detained C.B. from both parents and ordered supervised visitation.

III.    *Jurisdiction and Disposition*

In May 2022, Mother's Welfare-to-Work counselor reported that Mother and C.B. came to her office in April, but the counselor did not know where Mother was staying. Mother called from a blocked phone number and did not having any pending appointments with the counselor. The counselor said that she would attempt to schedule an appointment with Mother by offering her a clothing voucher the next time Mother called. DPSS filed declarations of due diligence describing the social worker's unsuccessful efforts to locate the parents.

C.B.'s older siblings were placed with maternal grandmother. When asked in May 2022, maternal grandmother denied knowing Mother's whereabouts and added that Mother had not visited C.B.'s siblings since February. Maternal grandmother asked to be contacted once C.B. was located so that she could be considered for C.B.'s placement.

DPSS filed a missing person's report for C.B. The parents were scheduled to visit C.B.'s older siblings in May 2022, but they did not show up and did not call to reschedule.

At the jurisdiction hearing in late May 2022, the court granted a continuance to allow the family to be located. The court requested that the district attorney's family abduction unit assist DPSS in locating the family.

6

In June 2022, the parents did not appear at their older children's contested selection and implementation hearing under section 366.26. The court terminated parental rights as to both B.B. and S.B.

Two weeks later, C.B. was located and detained from her parents with the assistance of law enforcement. The social worker contacted the parents and arranged a meeting, and the parents did not show.

In September 2022, the juvenile court held the jurisdiction and disposition hearings as to C.B. Although Mother was noticed to appear, she arrived several hours late. The court continued the hearing to the following day. The parents did not appear on time and asked to appear via telephone after the hearing had begun. The court sustained allegations that Mother and Father had a criminal history, that they lack stable housing, that they have a significant child welfare history, and that C.B.'s older siblings were previously declared dependents.

The juvenile court commented on the parents' lack of cooperation, stating that "I'm willing to find that there may have been one or more occasions where the parents were unable to appear in court based upon physical illness, but I will note from the reports that there's a substantial history of the mother and father failing to communicate and cooperate with the social worker. [¶] And I would like to particularly note that the parents canceled their visitation several times or more with [B.B.] and [S.B.]. The only inference I can draw from that is they wished to willfully evade the social worker." The

7

court bypassed reunification services for both parents under section 361.5, subdivisions (b)(10) and (b)(11) and set a section 366.26 hearing for January 2023.

IV.    *Section 388 Petition and Section 366.26 Proceedings*

In November 2022, DPSS filed declarations of due diligence for both parents, declaring that neither parent had been located. The following month, Mother provided the social worker with an updated phone number. In January, Mother filed a certificate of completion from a domestic violence course, a letter confirming completion of the same course, and a certificate of completion from a parenting course.

At a section 366.26 hearing date in January 2023, minor's counsel informed the court that the parents photographed C.B.'s genitals during a visit. Mother and Father did not appear at the hearing, but Mother had been in contact with her attorney. The court ordered counsel for the parents to provide the parents' updated addresses. The court continued the hearing.

DPSS continued its efforts to notice the parents for C.B.'s permanency hearing without success. In March 2023, the juvenile court found that DPSS conducted adequate due diligence and authorized DPSS to serve the parents through counsel.

The parents were permitted monthly supervised visits with C.B. The parents did not visit C.B. in December 2022. A two-hour makeup visit was scheduled in January 2023. In May 2023, DPSS cancelled a visit because Mother and Father failed to confirm that they would be present. The social worker texted Mother informing her that the visit was cancelled. Twenty minutes after the visit was scheduled to begin, the parents

8

arrived. DPSS staff again informed the parents that the visit had been cancelled. Afterward, Mother sent a text message to the social worker, stating: "'Fuck my visits . . . and fuck you.'" When the social worker asked Mother if she had received the message cancelling her visit, Mother responded: "'Yes . . . Now leave me the fuck alone . . . Bitch.'"

At the next section 366.26 hearing date, neither Mother nor Father appeared. The court attempted to call Mother without success. The court continued the hearing to September 2023. The court ordered DPSS to provide the parents with courtesy notice of the upcoming hearing.

DPSS spoke with maternal grandmother approximately two weeks later. Maternal grandmother reported that Mother and Father were homeless in the Hemet area. The parents were "living in a car but it was impounded," and now the parents "roam around sometimes between Hemet, Banning, and San Jacinto, but mainly in Hemet."

The following day, DPSS received a phone call from Mother. Mother refused to provide her home address and called from a blocked number. DPSS filed a declaration of due diligence, informing the court that the department had been unable to locate Father. The juvenile court again authorized DPSS to serve Mother and Father through their counsel.

The parents continued to visit C.B. inconsistently. The parents had missed some visits because they arrived late or not at all. They also refused to abide by the visitation rules, including bringing food to the visits, even though they were told that C.B. was

developing food allergies. During visits, they talked about the case with the visitation supervisor and discussed their "perceived injustices."

In July 2023, Mother gave birth to her fourth child, N.B. Mother gave a false name at the hospital, and she did not inform her social worker of her pregnancy or birth. When DPSS visited the parents in the hospital, they continued to lie about their other children. The parents only became cooperative after law enforcement identified them.

In September 2023, Mother filed a section 388 petition. Mother claimed that she had completed domestic violence and parenting programs and that she was engaged in services through Riverside University Health System. Mother claimed that Father had completed a parenting program and provided negative saliva tests. Mother asked the court for reunification services. Mother alleged that C.B. was bonded to her. Mother attached several documents to her petition, including the certificates of completion and letter that she had previously filed with the court, a letter from the parenting education program congratulating Mother for completing the class, a photo of a business card from Riverside University Health System, and negative saliva test results. Mother also attached a certificate and a letter showing that Father had completed a six-hour parenting class and a negative saliva test. Mother attached text messages between Mother and the social worker reflecting Mother's attempts to arrange visits, visitation logs, and receipts from Uber. Mother also attached pictures of herself and Father with C.B. Mother included pictures of C.B.'s newborn sibling, N.B., who had recently been removed by DPSS. Mother also provided pictures of the provisions she had collected for C.B.

Mother additionally attached screenshots of text messages in which she attempted to schedule a visit to see N.B. Mother also attached letters and certificates of completion from services she had completed before C.B. was born.

The court noted that although the prima facie standard is quite low, Mother "barely" met the requirements for an evidentiary hearing. DPSS's counsel and minor's counsel noted that the certificates that Mother provided were historical and that the parents had not completed any services in 2023.

Father filed documents including a screenshot indicating that Father had completed an anger management course, another screenshot indicating that Father had completed a domestic violence program, a certificate from a parenting training program, a certificate of completion from a four-hour behavior modification class, a progress report from a high-conflict parenting program, and a certificate showing that Father had completed a four-hour drug and alcohol awareness class. Father also filed photographs of himself with C.B. and the newborn N.B.

In October 2023, the juvenile court conducted the evidentiary hearing on Mother's section 388 petition. Parents participated by telephone. Mother's attorney asked the court to grant the section 388 petition and argued that Mother attempted to cooperate and communicate with DPSS. Mother also faulted DPSS for failing to refer her for a hair follicle test.

Minor's counsel opposed granting the petition and noted that DPSS made "a lot of efforts" to assist the family by providing bus passes, visits, and pre-visit drug tests.

11

Minor's counsel noted that DPSS did not send the parents to test as frequently as desired or refer the parents for a hair-follicle test. Minor's counsel noted that the parents continued to be deceptive and that the parents gave false names and dates of birth at the hospital when N.B. was born. Minor's counsel pointed out that Mother's evidence was largely historical and that some of the service providers were not approved by DPSS. Mother also frequently changed her phone number and used different email addresses to communicate with DPSS, which made it difficult to reach her. Minor's counsel expressed concern that the parents were a flight risk given their conduct with the children S.B., C.B., and the newborn N.B.

DPSS asked the court to deny the section 388 petition and noted that the text messages provided by Mother's counsel "show consistent communication between the social worker and the mother." DPSS argued that Mother failed to demonstrate changed circumstances and that the parents failed to learn anything from their two years of reunification services.

The court found the arguments of minor's counsel and county counsel "persuasive." The court noted that the parents have had many opportunities to "do the right thing, and they continued to do the wrong thing instead."

Before ruling, the court further observed "that Mom and Dad have had numerous telephone numbers and numerous addresses because of their financial situation, but their actions of being dishonest repeatedly with the Department hospital staff lead me to believe it's just a way of delaying things. It's a way of not becoming cooperative. It's

12

just their way of life, and it's a way of life that does not provide for the safety of kids and especially babies." The court stated that the parents continued to be without housing, which was exacerbated by the parents' habit of vandalizing their motel rooms. The court denied the petition because there were no changed circumstances and it was not in C.B.'s best interest to order reunification services.

The court then held C.B.'s section 366.26 hearing. Mother asked the court to find that the beneficial parental relationship exception applied, and she objected to the termination of parental rights. Mother argued that the visitation logs attached to her section 388 petition demonstrated that she sought to visit C.B. as much as possible. Father joined in Mother's argument. Minor's counsel and DPSS asked the court to terminate parental rights, as C.B. had been placed with relatives for almost 18 months, parents visited the child inconsistently, and it was in C.B.'s best interest to be adopted. The court found that C.B. was likely to be adopted and that no exceptions to adoption applied, and the court accordingly terminated Mother and Father's parental rights as to C.B.

V. *ICWA Background*

In B.B.'s case, Mother claimed that she had "Blackfoot" and Cherokee ancestry. Father claimed that he had Cherokee ancestry. In S.B.'s case, DPSS sent notices to the Blackfeet Tribe of Montana, the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee, and the United Keetoowah Band of Cherokee. All tribes responded that S.B. was not eligible for enrollment.

13

In May 2022, the ICWA-010(A) form attached to the section 300 petition regarding C.B. indicated that the social worker had been unable to complete an ICWA inquiry of Mother and Father.

At the detention hearing, the court found that ICWA did not apply to C.B.'s case. The parents were ordered to complete an ICWA-020 form. The court found that DPSS had conducted a sufficient inquiry.

In September 2022, DPSS contacted Mother and inquired about C.B.'s Indian ancestry.[1] Mother stated that "it is the same information that was previously provided for her other child, [B.B.]" Maternal grandmother denied having Choctaw Indian ancestry.

During the jurisdiction and disposition hearings, Father's counsel stated that he "wanted to raise the Choctaw issue, which the Department is welcome to continue to investigate." Father's counsel reported that Father's Choctaw ancestry was "recently disclosed." Father was ordered to fill out the appropriate ICWA form within 10 days. When the court inquired, Father claimed that the information was contained in a previous report filed for B.B. Mother reported that "Choctaw has never been noticed until June of 2022. Nobody knew about Choctaw. We just found out about Choctaw." The court then found that ICWA may apply.

Mother reported that C.B.'s paternal great-grandmother, Marie Berenice Lang, had Choctaw ancestry. Mother spelled the great-grandmother's name and provided her date

---

[1]     "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

14

of birth. Mother reported that the great-grandmother passed away in December 2015 in Riverside and was buried at Olive Cemetery in Riverside. Mother said that she could not provide contact information for any paternal relatives who had any more information, because she and Father "don't talk to [Father's] side of the family." The court ordered the parents to provide current information regarding their Indian ancestry to DPSS.

Following the hearing, DPSS sent "further inquiry" messages to the Cherokee Nation, the Blackfeet Tribe of Montana, the Jena Tribe of Choctaw Indians, the Choctaw Nation of Oklahoma, the Eastern Band of Cherokee Indians, the Mississippi Band of Choctaw Indians, and the United Keetoowah Band of Indians. DPSS listed various relatives of the family, including "Marie Lang." DPSS did not include the middle name, "Berenice," nor did it state her birthday, that she was potentially Choctaw, that she died in 2015, or that she was buried at Olive Cemetery in Riverside.

In November 2022, DPSS filed tribal response letters from the Mississippi Band of Choctaw Indians, the Cherokee Nation, and the Choctaw Nation. All three tribes denied that C.B., her older siblings, or the parents were tribal members or eligible for enrollment. The Choctaw Nation sent a one-line response stating that none of the individuals or dates of birth given was located in the tribe's system. The Cherokee Nation and the Mississippi Band of Choctaw Indians confirmed that the parents and C.B are not tribe members or eligible for membership.

In December 2022, DPSS filed a tribal response letter from the Choctaw Nation of Oklahoma. The tribe denied that C.B. was a member. The tribe specified that its

15

determination was based solely on the information provided and was subject to reconsideration at the discretion of the tribe.

DPSS also filed a response letter from the Blackfeet Tribe. The tribe denied that C.B. was a member, and the tribe explained that a blood quantum of one quarter Blackfeet blood is required for membership.

In January 2023, the parties stipulated that ICWA did not apply to C.B. and that DPSS and the court had conducted a sufficient inquiry into the child's ancestry.

Approximately six months later, the parties again stipulated that ICWA did not apply to C.B. and that DPSS and the court had conducted a sufficient inquiry into the child's ancestry.

At the section 388 and contested section 366.26 hearings, the court found that ICWA did not apply.

DISCUSSION

## I.     *Mother's Section 388 Petition*

Mother argues that the juvenile court abused its discretion by denying her section 388 petition, because circumstances had changed and ordering reunification services would be in C.B.'s best interest. We disagree.

"Section 388 permits the parent of a dependent child to petition the juvenile court for a hearing to modify an earlier order on the basis of changed circumstances or new evidence." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).) The petitioner bears the burden of showing that new evidence or changed circumstances exist and that the

16

proposed modification would be in the child's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

Regarding the best interest element, once the court has bypassed or terminated reunification services and set the matter for a section 366.26 hearing, "'the focus shifts to the needs of the child for permanency and stability.'" (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) A court hearing a section 388 petition at this stage in the proceedings "must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*In re Stephanie M.*, at p. 317.)

In determining whether the petitioner has carried their burden, the juvenile court considers the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) "Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion." (*J.C.*, *supra*, 226 Cal.App.4th 503, 525.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

Assuming for the sake of argument that Mother carried her burden of showing a material change of circumstances, her argument still fails because the juvenile court reasonably determined that granting her request for reunification services was not in

17

C.B.'s best interest. At the time of the section 388 hearing, C.B. had been in the care of her prospective adoptive parents for over a year and was "well bonded" with them. They were committed to C.B.'s needs and to providing permanency for her. And although Mother presented evidence that she had completed certain programs, she and Father were living "on the streets" in Hemet and showed little if any signs of having meaningfully addressed the issues that led to removal of C.B. Mother continued her longstanding pattern of being evasive with DPSS, calling the social worker from a blocked number and refusing to provide any information. Mother missed visits and arrived late. When she did visit, she was reluctant to follow the visitation rules, including introducing new foods to C.B. despite being told that the child was developing food allergies. For all of these reasons, it was not an abuse of the court's discretion to find that reunification services were not in C.B.'s best interest.

In arguing that ordering reunification services would be in C.B.'s best interest, Mother relies on the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*). *Kimberly F.* identified factors for evaluating a child's best interest under section 388, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, at p. 532.) But the same court that decided *Kimberly F.* subsequently declined to apply those factors and expressed skepticism about the

18

soundness of *Kimberly F.*'s approach. (*J.C.*, *supra*, 226 Cal.App.4th at p. 527.) The court reasoned that the *Kimberly F.* factors do not recognize that "after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability." (*J.C.*, at p. 527.) Mother's argument similarly fails to consider that shift in focus and also fails to view the record through the applicable standard of review. Mother argues that she had a good relationship with C.B. because she was "engaging," visited appropriately with her, and requested more visits. But the record reflects that Mother had almost no relationship with C.B.—Mother often missed or arrived late to her monthly visits, and her visits were often of poor quality when they did take place. The record contains no evidence that C.B. was notably eager at the start or upset at the end of visits or in any other way manifested a desire for more contact with Mother. And Mother's argument also fails to consider how well C.B. was doing in her prospective adoptive parents' care and that they were committed to adopting her. In sum, the court did not abuse its discretion by finding that it was not in C.B.'s best interest to order reunification services for Mother.

II.     *Further Inquiry Concerning Indian Ancestry*

Mother and Father argue, and DPSS concedes, that DPSS and the juvenile court failed to comply with the duty of further inquiry into C.B.'s Indian ancestry under section 224.2, subdivision (e). We accept DPSS's concession and conditionally reverse for compliance with the further inquiry duty.

19

DPSS and the juvenile court have an "affirmative and continuing duty to inquire" whether the child in a dependency proceeding "is or may be an Indian child." (§ 224.2, subd. (a).) In addition, "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c).) And if the juvenile court or the social worker has "reason to believe that an Indian child is involved," the court and social worker must "make further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).) There is reason to believe an Indian child is involved if the court or the social worker "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).) Further inquiry includes "[c]ontacting the tribe or tribes" and "sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination." (§ 224.2, subd. (e)(2)(C).)

Mother and Father point out, and DPSS concedes, that when DPSS contacted the tribes on September 27, 2022, DPSS failed to include the updated information that Mother had provided five days earlier concerning C.B.'s paternal great-grandmother. Specifically, DPSS omitted the great-grandmother's middle name, her date of birth, her date and place of death and place of burial, and the name of the tribe (Choctaw) with which she allegedly was affiliated.

We agree with the parties that DPSS did not fully discharge its duty of further inquiry, because it failed to provide the tribes with the updated information that DPSS

20

had received concerning the paternal great-grandmother.  We cannot say that the failure was harmless (*In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576), and we therefore conditionally reverse, which DPSS does not oppose.

## DISPOSITION

The order denying Mother's section 388 petition is affirmed.  The order terminating parental rights is conditionally reversed.  On remand, the juvenile court shall order DPSS to comply with the duty of further inquiry under subdivision (e) of section 224.2 and, if applicable, the duty to provide notice to the pertinent tribes under section 224.3.  If, after the court finds that DPSS has complied with those duties, the court determines that ICWA does not apply, then the court shall reinstate the order terminating parental rights.  If the court determines that ICWA applies, then it shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

FIELDS
Acting P. J.

RAPHAEL
J.

21